UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

-X

Case No. 1:20-cv-02831-RPK-RML

DAVID WHITAKER, an individual; MON ETHOS
PRO CONSULTING, LLC, a Massachusetts limited
liability company,

Plaintiff,

vs.

**DECLARATION OF DAVID A.
WHITAKER IN SUPPORT OF
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

BBF PARTNERS LLC, a New York domestic liability
company doing business as BUSINESS FUNDING
SOURCE; DAY TO DAY FUNDING LLC, a New
York domestic limited liability company; MZEED
INC., a New York domestic business corporation;
RAPID CAP, INC., a New York domestic business
corporation; and JANE AND JOHN DOES Nos 1-50
and/or XYZ CORPORATIONS 1-50

Defendants.

-------------------------------------------------------------------

-X

DAVID A. WHITAKER, pursuant to 28 U.S.C. §1746, states:

1.      I am the President of Mon Ethos Pro Consulting, LLC ("Mon Ethos"), an

executive level talent management company for executives, athletes and artists.

2.      I submit this declaration on behalf of myself and Mon Ethos in support of the

Temporary Restraining Order and Preliminary Injunction Mon Ethos and I are seeking

against BBF Partners LLC d/b/a Business Funding Source, Day to Day Funding, LLC,

and Mzeed, Inc., Rapid Cap, Inc. (collectively "Defendants") in connection with their

loans and lending practices to Mon Ethos and I.

1

3.     Mon Ethos is an athlete and talent brand management firm that offers services to up-and-coming athletes and talent.  Mon Ethos has many different types of contracts with clients and vendors.  Mon Ethos is extremely cautious when sharing information about its business, especially its contracts as some of Mon Ethos' contracts contain personal identifying information, proprietary information, non-disclosure agreements ("NDAs") and require I provide notice to the individuals with whom I have contracted with when their contract is shared with others such as a lender.

4.     As described more fully below, beginning in January of this year, I believe Mon Ethos and myself were targeted by a network of fraudulent individuals and companies involved in a lending scheme to defraud small businesses, such as Mon Ethos, to enter into business loans that have onerous loans terms.  These companies intentionally hid their associations with each other from me in the hopes to gain my business and trust.  These companies also engaged in deceptive loan servicing practices that has nearly caused Mon Ethos to lose its relationship with its bank BBVA. BBVA is requiring a Court Order to stop the fraudulent lending practices and from the individuals taking money from my bank accounts.  Moreover, I have strong concern that these individuals using aliases and their network of interrelated companies are part of a criminal money laundering scheme and are using ACH transactions through Mon Ethos' bank account to further that scheme.

5.     In January 2020, I was contacted by Vtek Rosa ("Rosa") of 1WestFinance regarding an offer of a small business loan for Mon Ethos.  When I spoke with Rosa he advised that 1WestFinance was a direct lender.  Rosa requested that I provide Mon Ethos' current financial information, copies of relevant contracts and Mon Ethos' tax return in order to evaluate my request for a loan.

6.     In order to ensure that Rosa and 1WestFinance maintained confidentiality, I had my attorney send Rosa a letter confirming that the information that I was going to provide to Rosa was confidential. He agreed that he would not use or use or disseminate

the information for any purpose other than in connection with the transaction. Attached hereto as **Exhibit 1** and incorporated herein by this reference is a true and correct copy of the February 3, 2020 letter to Rosa at 1WestFinance regarding the confidentiality of Mon Ethos documents.

7.     On or about February 5, 2020, Rosa provided me with a loan agreement that reflected 1WestFinance at the top but also referenced a company named EBF Partners, LLC d/b/a/ Everest Business Funding ("Everest") (the "Everest Loan"). The loan contract was for $23,000 and the maximum amount Mon Ethos was required to pay back was $34,500. I understood that I was required to make those payments and that the loan had to be paid off on that schedule. Attached hereto as **Exhibit 2** and incorporated herein by this reference is a true and correct copy of the Everest Loan agreement.

8.     On or about February 11, 2020, Rosa provided me with a contract for In Advance aka Advance Service Group, LLC which I signed ("Advance Loan"). The loan contract was for $22,000 and the maximum amount Mon Ethos was required to pay back was $32,120. I understood that I was required to make those payments and that the loan had to be paid off on that schedule.

9.     Shortly after the Everest Loan funded a debit was taken out of Mon Ethos' bank account by a company named Jaydee for $3,000 without any prior notification to me. On February 13, 2020, I sent a text to Rosa asking whether that was him. I told him that I need to know the names of the companies that are debiting monies out of the Mon Ethos account. Rosa responded and said it was 1WestFinance but I did not like that he did not tell me about that in advance. Attached hereto as **Exhibit 3** and incorporated herein by this reference is a true and correct copy of the text message between Rosa and me regarding the Jaydee debit.

10.     Around that same time, I was solicited for a loan by Sean Falik ("Falik") who represented that he was with Tribolt Capital ("Tribolt"). I never met Falik before this solicitation. Falik represented that Tribolt was a direct lender and broker and could help

Mon Ethos in obtaining a loan. I told Falik that he was not authorized to share my information outside of Tribolt. He falsely assured me that he would not do share my business information including proprietary, financial and personal identifying information outside of Tribolt. After reviewing the information I provided to him, Falik told me that he was able to get a loan approved for Mon Ethos.

11.     Based on the information that I have now, I believe that Rosa forwarded my contact information to Falik as at the time Falik represented that he had all the information that he needed to make a loan decision. "All the information" as represented by Falik was the *same information* I provided to Rosa.

12.     On or about February 25, 2020, Falik provided me with a loan agreement with Business Funding Source ("BFS") which I signed (the BFS 1st Loan). The loan contract was for $30,000 and the maximum amount Mon Ethos was required to pay back was $44,970. BFS charged a one-time $2,999 origination fee out of the $30,000 and deposited the loan proceeds into Mon Ethos' bank account. BFS was to take out five payments a week from Mon Ethos' bank account in the amount of $999. I understood that I was required to make those payments and that the loan had to paid off on that schedule. Attached hereto as **Exhibit 4** and incorporated herein by this reference is a true and correct copy of the BFS 1st Loan agreement.

13.     On February 28, 2020, I sent a text to Falik because $3,000 was taken out of the Mon Ethos account by Fund Capital without my knowledge or authorization. Falik explained it was for the Tribolt fees. I was upset because it appeared to be that Tribolt was paying itself a broker fee when Falik had represented to me that Tribolt was a direct lender. I did not know, authorize or participate in this, in fact, I told Falik he was not to share information with others. Falik responded that he worked for the direct lender. I told him the EIN numbers for the companies was not matching up and something seemed to be unlawful. Falik then wrote "[m]y company syndicates with other…. we are direct

4

lenders." Attached hereto as **Exhibit 5** and incorporated herein by this reference is a true and correct copy of the texts with Falik regarding the broker fees.

14.     In March 2020, Mon Ethos' business was negatively impacted by the Coronavirus and ensuing governmental lock-down orders.  Rosa represented that his company worked directly with the U.S. government and would be able to immediately get Mon Ethos a $10,000 loan under the Economic Injury Disaster Loan Emergency Advance program ("EIDL Program").  I told Rosa that Mon Ethos had already filed for the bridge funding with the SBA ($10K) and gave him a copy of Mon Ethos' application.  He said again that he "could be quicker since we work with the government."  Rosa said that in order to process the application I would need to pay $500 to 1WestFinance, which I did.  Rosa told me it would only take a week to process the application but I never received the $10,000.  Not only did Rosa rob me of time in trying to find a different company that could help me get the loan, but he also deceived me into paying him $500 in exchange for providing no work. s  He also repeatedly refused to provide me with information about the EIN or owner's name for 1WestFinance.  Attached hereto as **Exhibit 6** and incorporated herein by this reference is a true and correct copy of my texts with Rosa regarding the government loan.

15.     Upset by Rosa's and 1WestFinance's misrepresentations, on or about April 9, 2020, I filed complaint with the New York Attorney General's office regarding Rosa's and 1WestFinance' fraud and deceptive practices.  Attached hereto as **Exhibit 7** and incorporated herein by this reference is a true and correct copy of my complaint to the New York Attorney General.

16.     On that same day, I sent a letter to Kunal Bhasin, the founder and CEO of 1WestFinance, complaining of Rosa's, deceptive practices which practices included promising to help me get the government loan immediately and also funding transactions in names other than the names of the lender identified in the contract.  Attached hereto as

**Exhibit 8** and incorporated herein by this reference is a true and correct copy of my complaint letter to 1WestFinance.

17.    The response I received from Bhasin further evidenced the clandestine scheme of hiding behind alias and false companies. He said 1WestFinance and his company was not a lender nor were they lenders behind the government loan program. He also said that because they are not the lenders their loans fund in other company names but he did not explain why the loans did not fund in the name of the lender identified in the contract. Attached hereto as **Exhibit 9** and incorporated herein by this reference is a true and correct copy of text messages between myself and Bhasin at 1WestFinance. As a result of Rosa's false statements and Bhasin's response I did not feel comfortable working with 1WestFinance. It was not until later that I began to suspect that 1WestFinance was involved with Business Funding Source.

18.    In or around April 2020, Sean Falik of Tribolt introduced me to Anthony Davis ("Davis") at Tribolt. Davis advised that BFS was willing to make me another loan. On May 21, 2020, I signed a second loan agreement with BFS (the "BFS 2nd Loan"). The loan contract was for $45,000 and the maximum I was required to pay back was $67,455. BFS charged a one-time $4,499 origination fee and deposited the remainder of the $45,000 into Mon Ethos' bank account. BFS was to take out five payments a week from Mon Ethos' bank account in the amount of $1,699. I understood that I was required to make those payments and that the loan had to paid off on that schedule. Attached hereto as **Exhibit 10** and incorporated herein by this reference is a true and correct copy of the BFS 2nd Loan agreement.

19.    Around the time I signed the agreement for the BFS 2nd Loan, I received calls and an email from a person who identified himself as Allen Gold ("Gold") from The Kay Capital Group. In his email, Gold explained that that he was a direct lender and that I was approved for a $50,000 loan. Attached hereto as **Exhibit 11** and incorporated herein

by this reference is a true and correct copy of a May 21, 2020 email exchange between Gold and me.

20.     I responded shortly after receiving Gold's email and explained that I had other loans at this time and that any loan with Gold would be the third. *Id.* Gold explained that he was OK with that so long as the balances in the company's account was sufficient. Attached hereto as **Exhibit 12** and incorporated herein by this reference is a true and correct copy of a May 21, 2020 email exchange between Gold and me.

21.     The next day, on May 22, 2020, the BFS 2nd Loan funded and shortly after that an unauthorized entity named United Co. Fund ("United Co.") started debiting $1,699 from Mon Ethos' bank account which was the same amount due under the BFS 2nd Loan. I had never heard of the name United Co. and Davis never told me that any company other than BFS would be acting as the lender for the loan.   Not only did I not authorize any work from United Co., I had no idea who they were or what they were doing in my bank account.

22.     I sent text messages to Davis asking whether he knew what those debits were for and that I was going to block any future debits because I did not recognize the name United Co.  Davis seemed confused and responded "that's not us."  He then corrected himself and said "it's the same company with [sic] under a DBA that we Funded the first time."  I requested that Davis provide me with the DBA and EIN for United Co. but he never did.  Attached hereto as **Exhibit 13** and incorporated herein by this reference is a true and correct copy of text messages between Davis and me.

23.     I was upset because I never authorized Davis or BFS to share my information with any other lender and I believed that BFS was not transparent with its intentions and that this was a deceptive practice.  I was also upset that Davis and BFS were deceptive in their funding practices that Rosa was conjuring up at 1WestFinance – having the contract in one lender's name but debiting funds in another company's name.

24.     When BFS funded the BSF 2nd Loan on May 22, 2020 it also recorded a UCC-1 Form against Mon Ethos with the Secretary of the Commonwealth of Massachusetts. In that filing, BFS identified its address as 461 Van Brunt St., Brooklyn, NY 11231. Attached hereto as **Exhibit 14** and incorporated herein by this reference is a true and correct copy of the UCC-1 Form filed by BFS against Mon Ethos.

25.     At that time, because I was unhappy with BFS's lack of transparency and misrepresentations, I was willing to consider an alternative lending relationship. Gold continued to reach out to me offering to lend money and on May 28, 2020, I sent an email to Gold explaining that I was open to establishing a lending relationship with his company but that he was not authorized to pass his information to other brokers or lenders. Gold responded and assured me that he would "NEVER share any information about you or your business with anyone.. not even with other people at The Kay Capital Group.. only the underwriter gets to see the information." *Id.* I responded by asking Gold if the underwriter was with his company and emphatically told him that he was not to send my information to any other company. *Id.* Gold assured me that he would keep my information confidential. Attached hereto as **Exhibit 15** and incorporated herein by this reference is a true and correct copy of a May 28, 2020 email string between Gold and me. I also had telephone conversations with Gold where I explained to him that I did not want to do business with any company that was affiliated with BFS.

26.     The next day, on May 29, 2020, I advised Gold that I had an offer to consolidate all of the Mon Ethos loans into a 9-month loan. I asked Gold if he would be able to match that offer. Gold told me that he could do such a deal. He asked me to provide the information about the current loans including the loan balances, how much I pay each day and how many days on each loan. *Id.* Attached hereto as **Exhibit 16** and incorporated herein by this reference is a true and correct copy of a June 2, 2020 email string between Gold and me. Gold also asked me to provide a list of Mon Ethos' client contracts. I provided Gold with the information that he requested.

27. After further discussions with Gold I learned that a 9-month loan was not something that he could do – Gold did not explain the reasons why I was not approved for a 9-month loan or provide me with any documentation advising why the requested terms were denied.

28. On June 3, 2020, I followed up with Gold and stated that Mon Ethos would like to consolidate $258,592 in existing loans. I requested a loan of $300,000 with a maximum repayment of $390,000 in 90 days. The payments I was requesting was a daily rate of $4333.33 or a weekly rate of $21,665. Attached hereto as **Exhibit 17** and incorporated herein by this reference is a true and correct copy of a June 3, 2020 email string between Gold and me. Included in that email was a list of all of the loans that I wanted to consolidate:

| COMPANY | ORG DATE | DAILY | TOTAL PAYMENTS | AMOUNT | NO. OF PAID | PD AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|
| GREEN CAPITAL | MAY 21 | $973 | 65 payments | $72,950 | 7 payments | $6,811 | $66,139 |
| LAST CHANCE | MAY 21 | $2499 | 35 payments | $89,400 | 6 payments | $14,994 | $74,406 |
| LAST CHANGE | APR 17 | $1833.85 | 65 payments | $119,200 | 30 payments | $55,015.5 | $64,184.5 |
| UNITED CO. | MAY 22 | $1699 | 40 payments | $67,455 | 8 payments | $13,592 | $53,863 |

29. Later in the day Gold responded "Congratulations!!! I got this deal approved for you.." and that he would send me the contract later that day. Attached hereto as **Exhibit 18** and incorporated herein by this reference is a true and correct copy of a June 3, 2020 email string between Gold and me. Gold sold me on his company's ability to send out money instantly upon approval. However, I did not receive the contract that day and actually had to wait a couple of days before Gold sent anything to me.

30. On June 5, 2020, I finally received the contract from Gold but the terms were not consistent with the terms that I had requested even though Gold had previously said he got the deal approved for me. Attached hereto as **Exhibit 19** and incorporated herein by this reference is a true and correct copy of a June 5, 2020 email from Gold to me with contract. The contract was from a company called Day to Day Funding and Gold never

told me that he was sharing my financial information from Day to Day Funding. In fact, as set forth above, Gold said he would NEVER share my information. Also, Gold did not provide me with any reason for taking the adverse action of denying the loan terms that I had requested for Mon Ethos.

31.    I responded to Gold that "This is a reverse. I am not looking for a reverse." Attached hereto as **Exhibit 20** and incorporated herein by this reference is a true and correct copy of a June 5, 2020 email from me to Gold. A 'reverse' is when a lender put money in your account weekly to cover the amounts of existing loans. Typically, they extend the amount of time of the loan to lower the daily payments. In other words, Day to Day Funding was offering to put daily deposits into Mon Ethos' bank account to cover its daily loan expenses in exchange for fees and interest. That is not what I wanted.

32.    Gold made 10 unwanted calls to me to try to sway the deal to be signed before I would accept his call and he promised to make changes but required that I speak with the owner of Day to Day about the details. Below is an excerpt from my phone records showing Gold's repeated attempts to reach me:

| 857.272.4053 | 305.209.1955 | 2020-06-07 | 20:37:38 | 0:01:36 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 10:55:05 | 0:00:25 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:26:12 | 0:00:00 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:26:34 | 0:00:13 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:27:02 | 0:00:32 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:27:50 | 0:00:32 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:28:56 | 0:00:00 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:29:14 | 0:00:00 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:29:21 | 0:00:28 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 11:31:03 | 0:33:11 | NA |
| 857.272.4053 | 305.209.1955 | 2020-06-08 | 12:04:59 | 0:05:35 | NA |

33.    During this same time, my concerns regarding the BFS 2nd Loan were continuing to grow. On June 4, 2020, I was contacted by a person named Carmen Mejia represented that he worked at BFS and was following up on two missed payments. I had never met nor knew Mejia. Mejia also sent me a text BFS' wire information so that I could wire the

two payments to BFS. The wire instructions showed that BFS banked at Israel Discount Bank and that BFS's address was 461 Van Brunt St., Brooklyn NY 11231. Attached hereto as **Exhibit 21** and incorporated herein by this reference is a true and correct copy of text messages between Mejia and me.

34.     On June 5, 2020, I explained to Mejia that some of Mon Ethos' customers had missed making payments and that I would take care of transferring the payments to BFS. However, I also raised concerns about why BFS was contacting me for payments when the withdrawals that had been coming out of the Mon Ethos' bank account for the BFS 2nd Loan were not being from BFS (i.e. as detailed above, United Co. was withdrawing the payment). I told Mejia that "[t]his is starting to seem very shady." *Id.*

35.     I let Mejia know that Mon Ethos' general counsel would be reaching out to him to discuss these issues to help Mon Ethos figure out what was going on with United Co. as I was concerned about Mon Ethos being considered delinquent on the loans. *Id.* I sent Mejia my texts to Davis where I had requested the DBA and EIN for United Co. *Id.* I explained to Mejia that Davis said I could expect an email from Mejia providing the documents but I never received any email. I again asked Mejia to call the Mon Ethos general counsel so we could get the issue resolved. *Id.* My concerns with BFS were growing as BFS was refusing to provide me with information about United Co.

36.     In the meantime, Gold introduced me to Joel Geta ("Geta") by telephone to see if we could reach an agreement regarding the consolidation loan with Day to Day Funding. Gold said that Geta is his brother, business partner and underwriter (although Gold later said that Geta owns his own businesses). At that time, my understanding was that Geta owned Day to Day Funding in some form of partnership with Gold.

37.     Geta explained to me that he was the decision maker about the consolidation loan and that "I will never run out of money to give out." However, Geta told me that in order for Kay Capital or Day to Day to provide an actual consolidation I would need to payoff the BFS 2nd Loan in the amount of $45,000. I was not sure how Geta knew that I had a

loan from BFS because the information I provided to Gold identified that United Co. was the company withdrawing payments from Mon Ethos' bank account and not BFS. It was clear Gold, without my permission, shared my financial information with Geta.

38.     Geta explained that by paying off the debt Mon Ethos would be reducing its debit and daily payments. Geta offered to deposit $40,000 into Mon Ethos' bank account in addition to paying off the BFS 2nd Loan. The offer was for Mon Ethos to benefit from $85,000 minus $4,999 in fees with a new daily payment of $3,274 and a zero balance with BFS. I explained how I felt about my relationship with BFS and their lack of transparency and reiterated that I would not use BFS going forward or do business with anyone who did.

39.     I questioned Geta about his relationship with BFS and asked how he found out the payment amount of the loan with BFS. I asked Geta and Gold whether they had shared my information with BFS, in violation of the agreement to not disclose information about Mon Ethos without prior written authorization. Both Geta and Gold responded falsely that they had absolutely no association with BFS. Geta insisted that Mon Ethos needed to pay off the BFS loan because Mon Ethos was a new company with Geta and he needed to be cautious. I suggested that a better option would be to pay off the Mon Ethos' loans with either Last Chance or Green Capital but Geta insisted that it was the BFS loan that needed to be paid off and he would not agree to payoff anyone else.

40.     Geta repeatedly assured me that it was in Mon Ethos' best interest to make this deal and then he would consolidate all of Mon Ethos' loans exactly as I had requested, including the new loan that was being used to pay off the BFS 2nd Loan. Geta also assured me that if I agreed to these loans it would allow me to access to funds for other projects that I had been discussing with Gold at very reasonable rates. Geta also assured me on numerous calls that I was getting the consolidation that I requested and NOT a reverse consolidation. Based on Geta's and Gold's representations I agreed to move forward with the loans.

12

41.     I was getting very frustrated with the time it was taking to get these two transactions done because it was affecting my relationships with my clients because I was not comfortable entering into new business transactions without knowing that these loan were taken care of and I was worried that the delay on funding the loans would cause an overdraft on other amounts I was obligated to pay. I also became concerned my bank would freeze my account.

42.     On June 8, 2020, I sent a text to Gold expressing concerns about Gold's delays and excuses for not completing the consolidation deal: "For the upcoming project I may reach out to another lender. I need to get it taken care of if I'm going to do it." I further explained by text that "[e]veryone that I work with trusts my word and it puts me in an awkward spot when I'm forced to delay things after I've made a commitment." Attached hereto as **Exhibit 22** and incorporated herein by this reference is a true and correct copy of text messages on June 8, 2020 from me to Gold.

43.     On or about June 9, 2020, Gold asked that I provided an updated accounts receivable and client contracts list and I did so.

44.     On June 9, 2020, Geta provided me with a new loan contract of $330,000 and the maximum Mon Ethos would be required to pay back was $494,670. Day to Day Funding charged a one time $9,999 origination fee and was to take out five payments a week from Mon Ethos' bank account in the amount of $7,495 ("DTD 1st Loan"). I understood that I was required to make those payments and that the loan had to paid off on that schedule. Attached hereto as **Exhibit 23** and incorporated herein by this reference is a true and correct copy of the DTD 1st Loan agreement and Addendum.

45.     My understanding of the purpose of the Addendum, based on the numerous telephone calls that I had with both Gold and Geta leading up to me signing the DTD 1st Loan, is that it was meant to demonstrate how the $330,000 was calculated and to show that the amount my account would be debited daily for the $7,495. I was never told and never understood it to mean that by signing the Addendum I was agreeing to a reverse

13

consolidation. I would not have signed the DTD 1st Loan documentation if that had ever been communicated to me. I understood that the full amount of the loan proceeds from the DTD 1st Loan would either be deposited into my account or the loans that it would be consolidating would be paid off and any remaining loan proceeds would be deposited into my account.

46. On June 10, 2020, Geta provided me with a second loan agreement for Rapid Cap to payoff the BFS 2nd Loan ("Rapid Loan"). The Rapid Loan agreement was for $85,000 and the maximum Mon Ethos was required to pay back was $127,415 of which $45,000 was to pay off the BFS 2nd Loan and the remainder, minus fees, would be deposited into Mon Ethos' bank account. Rapid Cap was to take out five payments a week in the amount of $3,274, the Rapid Loan was supposed to be consolidated into the DTD 1st Loan. Attached hereto as **Exhibit 24** and incorporated herein by this reference is a true and correct copy of the Rapid Loan agreement.

47. As part of the Rapid Loan, I was required to sign a balance transfer agreement regarding Rapid Cap's payoff of the BFS 2nd Loan. Attached hereto as **Exhibit 25** and incorporated herein by this reference is a true and correct copy of the June 10, 2020 Balance Transfer agreement between Mon Ethos and Rapid Cap. The Balance Transfer Agreement provides Wire Instructions for Rapid Cap at Israel Discount Bank, the same bank that BFS used for its wire instructions. I did not understand that significance of that overlap at the time.

48. On June 10, 2020, Gold texted me to say I would be getting a call from a funder who do a funding call for both the DTD 1st Loan and the Rapid Loan Loan. Attached hereto as **Exhibit 26** and incorporated herein by this reference is a true and correct copy of a June 10, 2020 text from Gold to me.

49. I spoke with the funder later that day and we reviewed the loan terms together and I reiterated that the DTD 1st Loan was supposed to be a consolidation loan and not a

reverse consolidation. Based on the assurances that I received from the funder, Geta and Gold, both the DTD 1st Loan and Rapid Loan funded.

50. The Rapid Loan funded on June 10, 2020. When the Rapid Loan funded the Mon Ethos bank account reflected that the funds were deposited into the account by a company called "TAILORED FUND CAP". I sent a text to Gold asking why the company wiring the loan proceeds to Mon Ethos was Tailored Fund Cap. I explained my concerns about signing a contract with one company but then having another company deposit the loan proceeds and debit the account for payments. I said I did not want to be in a position where Rapid Cap could say it was never paid because some other company was taking my loan payments. Gold did not respond in any meaningful way other than to say "[o]ne evening I will give you the time to explain how all loans are structured." Attached hereto as **Exhibit 27** and incorporated herein by this reference is a true and correct copy of the text messages between me and Gold.

51. After the Rapid Loan funded I sent Gold a text and asked that he provide me with a zero balance letter for the United Co. loan aka BFS 2nd Loan. Attached hereto as **Exhibit 28** and incorporated herein by this reference is a true and correct copy of the text messages from me to Gold.

52. I also sent a text to Carmen Mejia ("Mejia"), a person who I had previously been communicating with at BFS requesting a zero balance letter. Attached hereto as **Exhibit 29** and incorporated herein by this reference is a true and correct copy of the text messages from me to Mejia.

53. On June 10, 2020, Gold provided me with a Zero Balance Letter from BFS for the BFS 2nd Loan. Attached hereto as **Exhibit 30** and incorporated herein by this reference is a true and correct copy of Gold's June 10, 2020 email to me with Zero Balance Letter. The address identified by BFS on the Zero Balance Letter is 461 Van Brunt St., Brooklyn, NY 11231. While I did not know it at the time, this is the same address used by Day to Day and Rapid Cap.

15

54.     Also, on June 10, 2020, the same day the BFS 2nd Loan was paid off, United Co. the alleged d/b/a for BFS, without my authority, debited the Mon Ethos account $499 for a monthly fee. I sent a text to Mejia asking why I was charged a monthly fee on the BFS 2nd Loan when it was not even a month old. Mejia said he would call to explain the next day but he never did. *See* **Exhibit 29**. I followed up with a text asking Mejia "Did you share my personal identifiers and loan information with another company? Without my permission?" Mejia never responded. I also sent Mejia a text asking him to terminate the UCC1 Form that was filed against Mon Ethos and Mejia never responded. *Id.*

55.     Unbeknownst to me and without my authority, on June 10, 2020, Rapid Cap filed a UCC-1 Form with the Secretary of the Commonwealth of Massachusetts. In that form, Rapid Cap identified its business address as 461 Van Brunt Street, Brooklyn, NY 11231, the same address as BFS. Attached hereto as **Exhibit 31** and incorporated herein by this reference is a true and correct copy of the UCC-1Form filed against Mon Ethos by Rapid Cap.

56.     On June 11, 2020, the Mon Ethos bank account starting getting hit with multiple ACH transactions. This was totally unexpected because when I spoke with the funder, Gold and Geta, I understood that the DTD 1st Loan would payoff and consolidate the following loans:

| COMPANY | ORG DATE | DAILY |
|---|---|---|
| GREEN CAPITAL | MAY 21 | $973.00 |
| LAST CHANCE | MAY 21 | $2499.00 |
| LAST CHANGE | APR 17 | $1833.85 |
| RAPID CAP | JUN 10 | $3,274.00 |

57.     Instead, what is happening is that those loans were not paid off and since the DTD 1st Loan multiple debits and credits have been made out of the Mon Ethos account on a daily basis triggering fraud alerts with Mon Ethos' bank. In other words, **the above**

**lenders are still making debits on their loans,** Day to Day is then depositing amounts equal to those debits, but is then debiting the account the payment for the DTD 1st Loan. An illustration of this daily activity is as follows:

| DEBITING COMPANY | DAILY DEBIT AMT | DAILY CREDIT AMT |
|---|---|---|
| GREEN CAPITAL | $973.00 | |
| LAST CHANCE | $2499.00 | |
| LAST CHANGE | $1833.85 | |
| RAPID CAP | $3,274.00 | |
| DAY TO DAY | | $973.00 |
| DAY TO DAY | | $2499.00 |
| DAY TO DAY | | $1833.85 |
| DAY TO DAY | | $3,274.00 |
| DAY TO DAY | $7,495.00 | |

58.     Day to Day is not crediting Mon Ethos' account until after the other lenders have debited Mon Ethos' account in the amount of each daily payment. This is purposeful as it requires Mon Ethos to effectively finance the first set of payments out of its own funds even though the whole purpose of the DTD 1st Loan was to consolidate these loans. I know that this is a calculated effort by Day To Day as I am able to track when Day to Day logs in to view the information in the Mon Ethos account and I have personally observed that it is waiting until the payments have been made to the original lenders before it deposits the daily credits in the Mon Ethos account. This scheme effectively allows Day to Day to pass $16,074.85 through Mon Ethos' bank account leaving a credit of only $1,084.85 in the account at the end of each day for all of the ACH transactions associated with the "consolidation" loan. It also results in nine (9) separate ACH transactions in a single day – most of which are debiting and crediting identical amounts.

59.     On June 11, 2020, when I discovered what Day to Day was doing, I sent a text message to Gold with a screenshot of the credits and debits coming out of the Mon Ethos account and asked him "[w]hat the hell is all of this." Gold responded "Nothing." I explained to Gold that he had created an accounting nightmare and that Mon Ethos' bank security and fraud department was calling me to try to figure out what was happening with all the ACH deposits and withdrawals. I told him I thought that he was engaging in a scam and that I did not want any more phone calls or bullshit. I then sent him a link to my attorney, Tracy Warren's, contact information. Attached hereto as **Exhibit 32** and incorporated herein by this reference is a true and correct copy of June 11, 2020 text messages between Gold and me.

60.     I also sent similar texts to Geta explaining that because of the ACH transaction I was on the phone with the security and fraud department of my bank because the bank wanted to know why there are so many ACH transactions and who the companies are that are taking them out. I reiterated that I repeatedly told Gold that I wanted a loan consolidation and the nonsense he was doing with the ACH payments was fraudulent. Attached hereto as **Exhibit 33** and incorporated herein by this reference is a true and correct copy of text messages between Get and me regarding the ACH transactions.

61.     While all of this was happening, I was in the process of obtaining another loan from Day to Day for $59,960 of which $40,000 would be deposited to Mon Ethos. Day to Day Funding would charge a one-time $3,999 origination fee out of that amount and would take out five payments a week from Mon Ethos' bank account in the amount of $1,699 ("DTD 2nd Loan"). I understood that I was required to make those payments and that the loan had to paid off on that schedule. Attached hereto as **Exhibit 34** and incorporated herein by this reference is a true and correct copy of the DTD 2nd Loan agreement.

62.     The DTD 2nd Loan funded on June 15, 2020. When the DTD 2nd Loan funded the Mon Ethos bank account reflected that the funds were deposited into the account by a

company called "BBF PARTNERS LLC." I have not been provided any information regarding this company despite requesting that from both Gold and Geta. However, Davis at Tribolt previously provided me with a W-9 for BBF Partners LLC ("BBF") which indicates that BBF is doing business as Business Fund Source with an address at 461 Van Brunt Street, Brooklyn, New York 11231. Attached hereto as **Exhibit 35** and incorporated herein by this reference is a true and correct copy of the W-9 for BBF. That is the same address listed for Business Funding Source in the wire instructions and Zero Balance Letter described above and for Rapid Cap in the above described UCC-1 Form.

63.    Moreover, after reviewing the loan agreements for the DTD 1st Loan, Rapid Loan and DTD 2nd Loan, each of them contain a Debit Card Authorization Form requiring that I authorize "BBF Partners and/or its affiliates to charge my debit card" which makes clear that they are all related. *See* **Exhibits 23, 24 and 34**.

64.    Furthermore, on June 16, 2020, Geta sent an email to Mon Ethos providing the wire information for Day to Day Funding. The wire information was for an account at Israel Discount Bank and identified the beneficiary as Business Funding Source d/b/a DaytoDay Funding. Attached hereto as **Exhibit 36** and incorporated herein by this reference is a true and correct copy of the text with screen shot of email with Day to Day wire information.

65.    Moreover, a closer look at Gold's company's website, The Kay Capital Group makes it appears as though it is a shell of a company and that the employees identified as part of "team" is sham as stock photos are reused with just the names changed. This is a deceptive practice designed to make it nearly impossible for a customer to figure out what individuals and companies are behind Kay Capital:



The Kay Capital Group (accessed 6/27/20) https://www.thekaycapitalgroup.com/.

66. Accordingly, BBF Partners, BSF, Day to Day and Rapid Cap and the companies that they fund under such as Tailored Fund Cap, Mzeed, Inc. d/b/a Rapid Cap act as one and the same. Attached hereto as **Exhibit 37** and incorporated herein by this reference is a true and correct copy of an email from Gold to me stating that Rapid Cap funds under Mzeed, Inc. Not only has the confidentiality of my personal information and Mon Ethos' financial been compromised but also these entities have worked together to extract exorbitant origination and interest fees without disclosing their connections.

67. While Mon Ethos has continued to pay the amounts due under the Green Capital and Last Chance loans (i.e. certain of the loans that were supposed to be consolidated into the DTD 1st Loan), on June 23, 2020, as a result of concerns from Mon Ethos' bank

regarding the ACH withdraws and Mon Ethos' concerns that these transactions are part of a criminal money laundering scheme, Mon Ethos ceased making payments on the DTD 1st Loan, Rapid Loan and DTD 2nd Loan.

68.     On June 25, 2020, Geta sent numerous texts to me demanding that Mon Ethos wire the payments. I explained that we needed to be able to verify who the parties are that Mon Ethos is payment before it can move forward with making the payments because Mon Ethos did not want to send money to people that it believed are committing fraud. Specifically, I stated that Mon Ethos was concerned that the consolidation that Day to Day was an attempt to launder or wash money. I offered to meet with Geta in person to go over these issues and I told him I would bring the checks with me. He refused to provide me his address or any other information about his companies. I also asked for the fully executed contracts on the loans and he refused to provide them. Attached hereto as **Exhibit 38** and incorporated herein by this reference is a true and correct copy of the June 25, 2020 text message between Geta and me.

69.     Instead of addressing my concerns, Geta threatened to send UCCs to all of the Mon Ethos' account receivables companies. He also said he would send out demand letters to one of Mon Ethos' biggest customers and the rest of Mon Ethos' account receivables if he did not receive the wire. *Id.* He also said that he was going to send my file to legal.

70.     The next day, on June 26, 2020, I received a text from an unlisted number with a picture of a noose. Attached hereto as **Exhibit 39** and incorporated herein by this reference is a true and correct copy of the June 26, 2020 text message. My belief is that this was a direct personal threat from Geta and Gold and the companies and persons that they are affiliated with because Mon Ethos is refusing to pay back these loans because Geta and Gold are refusing to provide information to support that they are legal business enterprises.

71.    Mon Ethos, has been and will continue to pay back legitimate debts that it incurs. That is why Mon Ethos has continued to pay the Green Capital and two Last Chance loans, which were supposed to have been paid off with the DTD 1st Loan.

**72.    However, Mon Ethos is requesting immediate relief from paying on the DTD 1st Loan, Rapid Loan and DTD 2nd Loan until the onerous terms of these loans are addressed and the validity of the companies behind these loans have been established with some certainty as Mon Ethos is not comfortable with being used as a pawn in what appears to be a criminal money laundering scheme.**

73.    If relief is not provided, I am concerned that Day to Day and Rapid Cap will start harassing Mon Ethos' clients and vendors by sending out demand letters to them in an effort to get direct payment of Mon Ethos' account receivables.  Additionally, I am concerned that they may also file confessions of judgment against Mon Ethos, although I have no record that Mon Ethos ever signed any confessions of judgment, based on the shady practices of Day to Day and Rapid Cap I am gravely concerned that Day to Day and Rapid Cap may manufacture confessions of judgment which will allow them to obtain judgment without any advance notice to me or Mon Ethos.  I am also concerned my credit with BBVA and other lending institutions will become further damaged causing irreparable harm to me and Mon Ethos.

Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 29, 2020

By:    _____
David A. Whitaker