**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

DAVID WHITAKER and
MON ETHOS PRO CONSULTING,

*Plaintiffs,*

-against-                                   Case No. 20-CV-2831

BBF PARTNERS LLC, DAY TO DAY
FUNDING LLC, MZEED INC., AND RAPID
CAP INC.,

*Defendants.*

# MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

BERKOVITCH & BOUSKILA PLLC
Ariel Bouskila
80 Broad Street, Suite 3303
New York, New York 10004
(212) 729-1477
*ari@bblawpllc.com*

*Counsel for BBF Partners LLC,*
*Day to Day Funding LLC, and Rapid Cap Inc.*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT……………………………………………………………………1

STATEMENT OF FACTS……………………………………………………………………..3

ARGUMENT………………………………………………………………………………...6

    I.      PLAINTIFFS FAIL TO ESTABLISH ANY OF THE ELEMENTS REQUIRED
           FOR A PRELIMINARY INUNCTION……………………………………..6

           A.  A preliminary injunction is an extraordinary remedy………………………...6

           B.  Plaintiffs have not remotely demonstrated irreparable harm…………………7

           C.  Plaintiffs are unlikely to succeed on the merits of any of their claims………10
                   1.  The Merchant Agreements are not loans……………………………11
                   2.  Plaintiffs may not seek affirmative relief based on usury or
                       unconscionability……………………………………………………15
                   3.  Plaintiffs claims sounding in fraud and misrepresentation are
                       without merit and do not absolve the Merchant of its remittance
                       obligations under the agreements………………………………….16
                   4.  Plaintiffs Equal Credit Opportunity Act claim is also meritless……..23

           D.  The balance of the equities and public interest favors denying the Motion....24

           E.  In the unlikely event that the Court grants a preliminary injunction,
              Plaintiffs are required to post a bond………………………………………...25

CONCLUSION…………………………………………………………………………..26

## TABLE OF AUTHORITIES

**Federal Cases:**

Allergan PLC v. New York ex rel. Schneiderman,
136 S. Ct. 581 (2015) …………………………………………………………………………..7

Benihana, Inc. v. Benihana Tokyo, LLC,
784 F.3d 887 (2d Cir. 2015) ………………………………………………………………………7

Buckingham Corp. v. Karp,762 F.2d 257 (2d Cir. 1985)…………………………………………7

Capela v. J.G. Wentworth, 2009 U.S. Dist. LEXIS 89425 (E.D.N.Y. 2009) …………………...24

Colonial Funding Network, Inc. v. Epazz, Inc., 252 F. Supp. 3d 274 (S.D.N.Y. 2017)………...19

Consolidated Brands, Inc. v. Mondi, 638 F. Supp. 152 (E.D.N.Y. 1986)…………………………..8

Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A.,
2019 U.S. Dist. LEXIS 180275 (S.D.N.Y. Oct. 17, 2019)………………….……………………… .25

Diaz v. Paragon Motors of Woodside, Inc., 424 F. Supp.2d 519 (E.D.N.Y. 2006) …………….24

Epsiritu Santo Holdings, L.P. v. Libero Partners, L.P.,
2019 U.S. Dist. LEXIS 84844 (S.D.N.Y. May 14, 2019)) ………………………………………25

Eugenia Vi Venture Holdings, Ltd., 649 F. Supp. 2d 105 (S.D.N.Y. 2008)……………………..21

Faiveley Transp. Malmo AB v. Wabtec Corp.,559 F.3d 110 (2d Cir. 2009) ……………………7

Fireman's Ins. Co. v. Keating, 753 F. Supp. 1146 (S.D.N.Y. 1990)……………………7, 8, 9, 10

German v. M&T Bank Corp., 111 F. Supp.3d 506 (S.D.N.Y. 2015) …………………………...24

Great Earth Intern. Franchising Corp. v. Milks Development,
311 F. Supp. 2d 419 (S.D.N.Y. 2004) …………………………………………………………...23

Huntington v. Marsh, 884 F.2d 648 (2d Cir.), cert. den'd, 494 U.S. 1004,
110 S. Ct. 1296 (1990) …..…………………………………………………….………8

In re CRM Holdings, Ltd., 2012 U.S. Dist. LEXIS 66034
(S.D.N.Y. 2012)………………………………………………………………………………11

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 870 (2d Cir. 1979) ……………………8

JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75 (2d Cir. 1990) …………………………6, 8

Kaleidoscope Media Group, Inc. v. Entertainment Solutions, Inc.,
2001 U.S. Dist. LEXIS 10801 (S.D.N.Y. 2001) …………………………………………..........22

Kaplan v. Board of Education,759 F.2d 256 (2d Cir. 1985) …………………………………..8

Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447 (2d Cir. 1997) …………………………17

N. Am. Soccer League, LLC v. United Soccer Fed'n, Inc.,
883 F.3d 32 (2d Cir. 2018) …………………………………………………………………..…7

N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286 (2d Cir. 2012) ………………11

Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520 (2d Cir. 2004) ……………………22

New York ex rel. Schneiderman v Activas PLC, 787 F.3d 630 (2d Cir. 2015)…………………..7

Osan Ltd. v. Accenture LLP, 454 F. Supp. 2d 46 (E.D.N.Y. 2006)…………………………19, 23

Pasternak v. Dow Kim, 961 F. Supp. 2d 593 (S.D.N.Y 2013)……………………………….…22

Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc.,
2019 U.S. Dist. LEXIS 57527 (E.D.N.Y. April 3, 2019) ………………………………………13

Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.,
2019 U.S. Dist. LEXIS 57527 (E.D.N.Y. April 3, 2019) ………………………………………...2

Professional Merchant Advance Capital LLC v. C Care Services, LLC,
2015 U.S. Dist. LEXIS 189531……………………………………………………………….…2, 14

Republic Nat'l Bank v. Hales, 75 F. Supp. 2d 300 (S.D.N.Y. 1999) …………………………..…17

Rodriquez ex rel. Rodriquez v. DeBuono, 175 F.3d 227 (2d Cir. 1999) …………………………7

Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380 (7th Cir. 1984) ……………..…9

Sampson v. Murray,
415 U.S. 61, 94 S. Ct. 937 (1974) …....………………………………...........................................8

Scantek Med., Inc. v. Sabella, 582 F. Supp.2d 472 (S.D.N.Y. 2008) …………………………...15

Sensus USA, Inc. v. Franklin,
2016 U.S. Dist. LEXIS 50182 (D. Del. April 14, 2016) ………………………………………...25

Simington v. Lease Fin. Group, LLC, 2012 U.S. Dist. LEXIS 25671 (S.D.N.Y. 2012) ….……22

Steingerwald v. Bradley, 136 F. Supp.2d 460 (D. Md. 2001) …………………….……………24

Tom Doherty Assocs. v. Saban Entm't, Inc.,60 F.3d 27 (2d Cir. 1995) …………..……………..9

Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969 (2d Cir. 1989) ……..……………7

Villa Marin Chevrolet v. Gen. Motors Corp., 1999 U.S. Dist. LEXIS 17972
(E.D.N.Y. Nov . 18, 1999) …………………………………………………..…………..………17

Winter v. NRDC, Inc., 555 U.S. 7, 129 S. Ct. 365 (2008)………………………………………..6

Womack v. Capital Stack, LLC, 2019 U.S. Dist. LEXIS 148644
(S.D.N.Y. Aug. 30, 2019) ………………………………………………………….…...2, 12, 20

Zambetti Fireworks Mfg. Co., Inc. v. Wood,592 F.3d 412 (3d Cir. 2010) ……………..…….26

**State Cases:**

Champion Auto v. Pearl Beta Funding, LLC,
159 A.D.3d 507 (1st Dept.), leave den'd, 31 N.Y.3d 910 (2018) …………………………….14

Donatelli v. Siskind, 170 A.D.2d 433 (2d Dept. 1991)……………………………….…………11

K9 Bytes, 56 Misc.3d 807 (Sup. Ct. West. Co. 2017)……….………………….…....14, 15, 19

Kelly, Grossman & Flannagan, LLP v. Quick Cash, Inc.,
35 Misc.3d 1205(A), 950 N.Y.S.2d 723 (Sup. Ct. Suff. Co. 2012)…….................................12, 13

Primex Int'l Corp. v. Wal-Mart Stores, 89 N.Y.2d 594 (1997)…………………………………17

Rapid Capital Fin. LLC v. Natures Mkt. Corp.,
57 Misc.3d 979, 66 N.Y.S.3d 797 (N.Y. Sup. Ct. 2017)…………………………………13, 14

Seidel v. 18 E. 17th St. Owners, 79 N.Y.2d 735 (1992) ………………………………………11

Starr Found v. American Intl. Group, Inc., 76 A.D.3d 25 (1st Dept. 2010)………………………22

Ujueta v. Euro-Quest Corp., 29 A.D.3d 895 (2d Dept. 2006) …………………………………..12

Urtz v. New Hork Cent. & Hudson Riv. R.R. Co., 202 N.Y. 170 (1911).………………………21

Zoo Holdings v. Clinton, 2006 N.Y. Misc. Lexis 225
(Sup. Ct. N.Y. Jan. 24, 2006)…………………………………………………….…………...12


**Statutes:**

Rule 65(c) of the Federal Rules of Civil Procedure ………………………………………….3, 25

Rule 12(f) of the Federal Rules of Civil Procedure………………………………………...…11

Equal Credit Opportunity Act (15 U.S.C. § 1691) …………………………………….…23, 24

12 C.F.R. § 202(c)……………………………………………………………………………..24

## PRELIMINARY STATEMENT

BBF Partners, LLC ("BBF"), Day to Day Funding LLC ("DDF"), and Rapid Cap, Inc. ("RDC" and together with BBF and DDF, the "Defendants" or "Funders") respectfully submit this memorandum of law in in opposition to the motion of Mon Ethos Pro Consulting, LLC (the "Merchant") and David Whitaker ("Whitaker") (collectively, "Plaintiffs"):

> (1) preliminarily enjoining Defendants from "engaging in the illegal and fraudulent practices" set forth in the Complaint, including "stopping the withdrawal of funds from Plaintiffs' bank accounts; and
>
> (2) preliminarily enjoining Defendants from "taking any steps to collect payments on account of any loans, merchant cash advances, or other transactions involving Plaintiffs, including, but not limited to, (i) ceasing all efforts to make withdrawals from Plaintiffs' bank accounts, (ii) refraining from contacting any of Plaintiffs' customers, clients, or vendors, and (iii) refraining from filing any UCC statements, confessions of judgment, or other documents designed to create or perfect an interest in property as security relative to the loans and/or merchant cash advances to Plaintiffs."

(the "Motion").

The merits of the Motion are fully addressed below.  First, Plaintiffs have utterly failed to show any irreparable harm absent the injunction requested.  Plaintiffs vaguely allege that they "fear the loss of all goodwill and business reputation" if the Defendants exercise their remedies under the contracts by issuing UCC notices to creditors and continuing to withdraw funds as "authorized under the purchase and sale agreements."  However, Plaintiffs nowhere disclose any information relating to their financial ability to continue making payments or their receivables. The alleged "threats" made by Defendants simply have no bearing on whether the Merchant should continue to perform under the contracts or whether Defendants retain the right to exercise the remedies arising from their secured position under the agreements, including those afforded by the UCC.  Those rights were given to Defendants as an inducement for Plaintiffs' receipt of significant upfront working capital from the Defendants.

1

Second, Plaintiffs are not likely to succeed on the merits, whether analyzed through a "more likely than not" standard or the heightened standard attendant to mandatory injunctions such as that sought here. The underlying transactions are not "loans," as a matter of law, irrespective of how the transactions were verbally characterized to the Plaintiffs. Each of the numerous commercial agreements executed by Plaintiffs – who clearly are quite experienced in obtaining this form of financing – explains precisely how the remittances work and the nature of the transaction. As they so state, the contracts are a purchase and sale of receipts requiring remittances over an indeterminant period.

Numerous federal courts have rejected the usury and fraud claims made by Plaintiffs. See Womack v. Capital Stack, LLC, 2019 U.S. Dist. LEXIS 148644 (S.D.N.Y. Aug. 30, 2019); Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc., 2019 U.S. Dist. LEXIS 57527 (E.D.N.Y. April 3, 2019); Colonial Funding Network, Inc. v. Epazz, Inc., 252 F. Supp. 3D 274 (S.D.N.Y. 2017) (dismissing analogous usury and fraud claims); Professional Merchant Advance Capital LLC v. C Care Services, LLC, 2015 U.S. Dist. LEXIS 189531 (S.D.N.Y. Aug. 3, 2015). These Courts have consistently held that the transactions are in no way "criminal" or "usurious," that it is not actionable fraud if the Plaintiff somehow thought the transactions were "loans" despite the clear terms of the agreements, and that the alleged inter-relationship among the funding companies and true identifies of various individuals involved is simply immaterial to the enforceability of the agreements.

Plaintiffs received what they bargained for – a significant and immediate infusion of working capital that they could not obtain elsewhere, and that apparently now intend to retain, thereby creating a windfall. It is simply not the public policy of this state, or in any way equitable, to permit a business entity to retain the proceeds of a sale while indefinitely forgiving the seller's

performance under the agreement without any protection in place.  The preliminary injunction sought here would yield precisely that result and afford Plaintiffs the very "rescission" that they ultimately seek after trial.

Ultimately, Plaintiffs are claiming that the transactions did not operate as Plaintiffs had intended, a difficult allegation to accept considering the vast experience and understanding Plaintiffs enjoyed as to this and apparently many other types of financing.  If Plaintiffs believe they have overpaid on the agreements, that does not constitute a tort and does not excuse a wholesale default under the agreements while retaining the proceeds they received, particularly since Plaintiffs do not assert any claim for breach of contract.

The Funders take no issue with a mutual injunction prohibiting each of the parties from communicating or interacting with each other.  The Funders only object to Plaintiffs' attempt to obtain judicial cover for their defaults under the agreements, leaving the Funders without the remedies enshrined in the contracts and any other protection against Plaintiffs.  To the extent the Court stays any enforcement of the contracts, Rule 65(c) requires the posting of a bond sufficient to protect the Defendants pending trial.

Accordingly, the Motion should be denied.

## FACTS

According to Plaintiffs, between February 25, 2020 and June 15, 2020, Merchant sold a fixed percentage of its future accounts receivable to the Defendants and received a significant amount of upfront working capital from the Defendants as a "purchase price" for the sale.  See Merchant Agreements, annexed to the Complaint as Exhibits 1 through 5. All of the Merchant Agreements provide for an estimated daily payment, which, as the agreements so state, is an approximation of the specified percentages of the Merchant's accounts receivable purchased by

the Defendants, to be deducted from the Merchant's account each business day.  If the aggregate

daily payments for any given month differ from the specified percentage of receivables purchased,

the Merchant Agreements all provide for a reconciliation as follows:

> [Funders] will either (i) debit the Specified Percentage on a daily basis or (ii) if a
> Specific Daily Amount is specified hereunder, then [the Funders] shall debit the
> Specific Daily Amount on each business day, and upon Merchant's request, and
> receipt of the Merchant's monthly bank statements, [the Funders] shall, on or about
> the fifteenth day of each month, reconcile the Merchant's account by either
> crediting or debiting the difference between the amount debited and the Specified
> Percentage, from or back to the Merchant's bank account so that the amount debited
> each month equals the Specified Percentage.

(the "Reconciliation Provisions").  Complaint, Exs. 1-5 at p. 1.

The Merchant Agreements clearly and unequivocally provide that the transactions

effectuated thereby are purchases and sales of receipts, not loans.  Id. at §§ 1.9:

> 1.9 Sale of Receipts.   MERCHANT AND [FUNDER] AGREE THAT THE
> PURCHASE PRICE UNDER THIS AGREEMENT IS IN EXCHANGE FOR THE
> PURCHASED AMOUNT AND THAT SUCH PURCHASE PRICE IS NOT
> INTENDED TO BE, NOR SHALL IT BE CONTRUED AS A LOAN TO
> MERCHANT.  Merchant agrees that the Purchase Price is in exchange for the
> Receipts pursuant to this Agreement and quals the fair market value of such
> Receipts.  [Funder] has purchased and shall own all the Receipts described in this
> Agreement up to the full Purchased Amount as the Receipts are created.  Payments
> made to [Funder] in respect to the full amount of the Receipts shall be conditioned
> upon Merchant's sale of products and services and the payment therefore by
> Merchant's customers in the manner provided in Section 1.1.

The Merchant's primary requirement under the Merchant Agreements was to remit a fixed

daily percentage of its actual receipts to the Funders until the purchased amounts of the receipts

was fully remitted.  The Reconciliation Provisions contained in the Merchant Agreements provide

for a *mandatory* monthly reconciliation if the aggregate amount of the specified daily payments

for any given month differ from the specified percentage of the accounts receivable purchased.

The Reconciliation Provisions are not self-executing; rather they require the Merchant to make a

request for a reconciliation and provide the monthly bank statements necessary to perform the

reconciliation.  Because the Merchant Agreements contain mandatory reconciliation provisions, the period over which the purchased amounts of the receivables could be remitted is indeterminant.

The Merchant claims "upon information and belief" that reconciliations were never performed.   Complaint at ¶¶ 60, 82, 99 & 116.  This allegation, particularly as framed, only proves that the Merchant never requested such a reconciliation, as was its obligation under the contracts. The natural implication of the foregoing is that Merchant was not overpaying through the estimated daily payments.  Indeed, and tellingly, nowhere in any of its submissions does the Merchant provide the Court with even a glimpse of its revenues during the relevant period.  It is the Merchant, not the Defendants, who is in the sole position to disclose its actual receipts, and it is precisely for this reason that the Reconciliation Provisions are not self-executing.  All the Reconciliation Provisions specifically provide that the Funders shall perform the reconciliation "upon Merchant's request, and receipt of the Merchant's monthly bank statements …."

The Merchant Agreements all provide that they are fully integrated, and each expressly states that, "this Agreement and Security Agreement hereto embody the entire agreement between Merchant and [the Funders] and supersede all prior agreements and understandings relating to the subject matter hereof."   Merchant Agreements at ¶ 4.9.   Plaintiffs do not claim to have misunderstood those terms, nor could they make such a claim. Furthermore, each of the Merchant Agreements contains a personal guaranty of "performance" defined as the merchant's remittance of a daily *percentage* of collected receipts until the purchased amount of receipts is remitted back to the Funders, no matter how long that takes.

Perhaps most relevant to the Motion, Plaintiffs acknowledge that they were paid the purchase prices required under the various agreements, that they authorized Defendants to auto-debit their operating account, and that, absent an injunction, Defendants would be fully within

their rights to protect their secured interest in the receivables they purchased by issuing UCC liens to Merchant's creditors.

Plaintiffs lace their submissions with libelous allegations, to the effect that commercial agreements are actually "criminally usurious loans," that Defendants are somehow "laundering money," and that Defendants engaged in a sinister scheme to conceal their inter-relationship from Mr. Whitaker.  Plaintiffs do not allege, however, that they have actually been damaged by any of these allegations.  To the contrary – Plaintiffs received the working capital required by the agreements and sit in the same position whether or not their allegations sounding in tort existed.[1]

## ARGUMENT

## I.   PLAINTIFFS' FAIL TO ESTABLISH ANY OF THE ELEMENTS REQUIRED FOR A PRELIMINARY INJUNCTION.

### A.   A preliminary injunction is an extraordinary remedy.

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter."  JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990).  Accord Winter v. NRDC, Inc., 555 U.S. 7, 24, 129 S. Ct. 365 (2008) (a preliminary injunction is "never awarded as of right").  Generally, "a party seeking a preliminary injunction must ordinarily establish:  (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; (3) that the balance of hardships tips in its favor; and (4) that a preliminary injunction is in the public

---

[1]    Plaintiffs further allege that an unknown individual, who they believe is affiliated with the Defendants, texted a picture of a noose shortly before the filing of this lawsuit.  This speculative allegation is neither relevant to their request for an injunction, nor is it capable of a response from the Defendants.  Numerous individuals were involved in these transactions, making it impossible to obtain a declaration from each of them denying their involvement on short notice.

interest." New York ex rel. Schneiderman v Activas PLC, 787 F.3d 630, 650 (2d Cir. 2015), cert. dismissed sub nom., Allergan PLC v. New York ex rel. Schneiderman, 136 S. Ct. 581 (2015) (citations omitted); Benihana, Inc. v. Benihana Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015).

"The purpose of a preliminary injunction is to preserve the status quo." Anthony Realty Corp. v. Schesinger, 888 F.2d 969, 972 (2d Cir. 1989). As such, any request for a mandatory injunction is subject to particularly heightened scrutiny. See N. Am. Soccer League, LLC v. United Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) ("Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo—that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" (internal quotations omitted)). In this case, Plaintiffs seek to alter the status quo by precluding any further performance under the contracts – i.e., the ongoing remittance of the receivables sold to the Defendants. Id. As is discussed below, Plaintiffs have wholly failed to meet the heightened burden, or even any burden, governing such relief.

### B.   Plaintiffs have not remotely demonstrated irreparable harm.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009); Rodriquez ex rel. Rodriquez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999); Fireman's Ins. Co. v. Keating, 753 F. Supp. 1146, 1150 (S.D.N.Y. 1990) ("The Second Circuit has repeatedly stressed the importance of a showing of irreparable harm by the movant."). "Inequitable conduct alone cannot justify the entry of a preliminary injunction. The linchpin of such interim relief is that threatened irreparable harm will be prevented by that injunction." Buckingham Corp. v. Karp, 762 F.2d 257, 262 (2d Cir. 1985).

The Second Circuit has consistently stressed that in order to be deemed "irreparable," the harm alleged by the movant "must be one requiring a remedy of more than mere monetary damages."  Tucker Anthony, supra, 888 F.2d at 975.  Accord Huntington v. Marsh, 884 F.2d 648, 651 (2d Cir. 1989), cert. den'd, 494 U.S. 1004, 110 S. Ct. 1296 (1990); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 870, 72 (2d Cir. 1979) ("Irreparable injury means injury for which a monetary award cannot be adequate compensation.").  "A monetary loss will not suffice unless the movant provides evidence of damage that cannot be rectified by financial compensation."  Id.

Furthermore, "to establish irreparable harm, plaintiffs must demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'"  Tucker Anthony, supra, 888 F.2d at 975 (quoting Consolidated Brands, Inc. v. Mondi, 638 F. Supp. 152, 155 (E.D.N.Y. 1986).  Accord Kaplan v. Board of Education, 759 F.2d 256, 259 (2d Cir. 1985).  It is not sufficient for a movant to demonstrate merely the possibility of irreparable harm.  Keating, supra, 753 F. Supp. at 1150.  "An applicant for a preliminary injunction must show that it is *likely* to suffer irreparable harm if equitable relief is denied."  JSG Trading, supra, 917 F.2d at 79 (emphasis in original).  Thus, the standard that movant must meet is "extremely high."  Keating, supra, 753 F. Supp. at 1150.  As the Supreme Court explained in Sampson v. Murray, 415 U.S. 61, 94 S. Ct. 937 (1974):

> The temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury....  The key word in this consideration is *irreparable*.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

Id., 415 U.S. at 90 (internal citations and quotations omitted).  Accord Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, 38 (2d Cir. 1995) (Second Circuit cases "stand for the general

proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.").

In the case at bar, Plaintiffs' seek unspecified money "damages to be proven at trial" or, even more speculatively, "damages" for each cause of action alleged in the Complaint.  See Complaint ECF Doc. No. 1, at p. 26.  Thus, "the rights that plaintiff may lose if injunctive relief is denied are, when plainly viewed, simply rights to money."  Keating, supra, 753 F. Supp. at 1156. While Plaintiffs also seek "rescission of the agreements," they have already accepted the purchase prices under the contracts, are not offering to refund any portion of those funds, and, as a matter of law, may not seek rescission as affirmative relief.  Furthermore, a claim based in equity is subject to the same requirement that plaintiffs demonstrate irreparable harm absent immediate relief.  See Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984) ("The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief.").   No such showing has been made here.

In briefly addressing irreparable harm, Plaintiffs provide only conclusory and speculative allegations of harm to their business.  As is stated in their Memorandum of Law:

> Plaintiffs fear the loss of all goodwill and business reputation if Plaintiffs exercise self-help in stopping the payments, due to Defendants' possession of Plaintiffs' customer information, and threats to contact Mon Ethos customers and vendors directly to collect payment. (Id. at ¶¶ 69 and Ex. 38.) Defendants have threatened to destroy Plaintiffs' relationship with their clients, by sending UCCs to the Mon Ethos' account receivables companies. (Id.) Defendants expressly threatened to send demand letters to one of Mon Ethos' biggest customers and the rest of Mon Ethos' account receivables if Plaintiffs declined to pay Defendants the outstanding amounts. (Id.)

ECF Doc. 13, at p. 18.

Plaintiffs have filed no less than three Declarations accompanied by numerous exhibits, but have provided the Court with no business documents, such as bank statements or financial records, reflecting their gross or net revenues, liabilities, assets, or expenses.  Notably, Plaintiffs fail to allege that, despite the ongoing daily debits, they are in a worse financial position now than prior to receiving Defendants' purchase prices, even factoring the remittances that have been made to date.  This issue is glaringly left unaddressed, raising the distinct possibility that Plaintiffs are improperly using the Motion as a vehicle to nullify the contracts and secure a windfall.

Finally, Plaintiffs allege that "where a non-movant's assets may be dissipated before final relief can be granted, or where a non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless, injunctive relief is proper."  Memo of Law, at p. 18 (citing Keating, supra, 753 F. Supp. 1146).  Plaintiffs then mistakenly attempt to demonstrate such "dissipation of assets" by citing to the daily debits Defendants are making under the contract *from Plaintiffs' bank account*.  The "dissipation" referred to in Keating and other cases, however, is a reference to the Defendants' dissipation of their *own* assets so as to render them judgment proof prior to trial.  There is absolutely no such evidence in the record before the Court, just as no such evidence existed in the Keating case, leading the Court to deny plaintiff's request for an injunction.

Accordingly, Plaintiffs have failed to meet their burden of demonstrating irreparable harm.

**C.    Plaintiffs are unlikely to succeed on the merits of any of their claims.**

Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing "a clear or substantial likelihood of success on the merits." N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation omitted).  Even under the less stringent "more likely than not" standard, however,

Plaintiffs have failed to satisfy their burden on this element of their request for a preliminary injunction.

### 1.   The Merchant Agreements are not loans.

In support of their allegation that the transactions effectuated by the Merchant Agreements are "criminally usurious" or "illegal," Plaintiffs cite only to the *allegations in a Petition recently* filed by the New York State Attorney in People v. Richmond Capital Group LLC, et al., Index No. 451368/2020 (the "AG Complaint").   See Plaintiff's Memo of Law, at p. 2.   Notably, that complaint does not contain any allegations pertaining to any of the Defendants in this action.   Nor, as a matter of law, can it support any of the causes of action in this case.   See In re CRM Holdings, Ltd., 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. 2012) ("As an initial matter, Plaintiffs' citation to "unproven allegations" made in the WCB or NYAG complaints do not constitute factual allegations…. 'Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f).'").

Under New York law, a contract cannot be usurious if, as in this case, it does not constitute a loan.   See Seidel v. 18 E. 17th St. Owners, 79 N.Y.2d 735, 744 (1992) (internal citation omitted); Donatelli v. Siskind, 170 A.D.2d 433, 434 (2d Dept. 1991) ("It is well established that there can be no usury in the absence of a loan or forbearance of money.").   An agreement is not a loan unless it provides (1) a right of interest on principal, (2) paid over a fixed term, and (3) an absolute right of repayment.   See Donatelli, supra, 170 A.D.2d at 434; Kelly, Grossman & Flannagan, LLP v. Quick Cash, Inc., 35 Misc.3d 1205(A), 950 N.Y.S.2d 723 (Sup. Ct. Suff. Co. 2012); Zoo Holdings v. Clinton, 2006 N.Y. Misc. Lexis 225, at *10 (Sup. Ct. N.Y. Jan. 24, 2006).   "Usury must be proved by clear and convincing evidence as to all its elements and usury will not be presumed."

Id.  "There is a strong presumption against the finding of usury."  Ujueta v. Euro-Quest Corp., 29

A.D.3d 895, 895-96 (2d Dept. 2006).

In Womack v. Capital Stack, LLC, 2019 U.S. Dist. LEXIS 148644 (S.D.N.Y. Aug. 30,

2019), Judge Carter surveyed New York case law and confirmed that similarly worded agreements

backed by analogous confessions of judgment, personal guarantees and security agreements, were

contingency financing, not "loans" in that the purchaser – in this case the Funders – bore the risk

that future receipts would not materialize.  Id. at p. * 13-14.  Judge Carter found dispositive that

the daily payments were only estimates subject to a true up against the specified percentage

through a reconciliation provision, and that a bankruptcy did not trigger a default under the

agreements.  The Court noted that "at least twenty-eight other recent decisions by State and Federal

courts in New York found that similar MCA transactions were not loans subject to New York's

usury laws."  Id.  at p. * 15.  The Court dismissed a merchant's usury claim as a matter of law,

concluding that they were risk-based financing and did not guaranty repayment absolutely.

The importance placed by Judge Carter on the reconciliation provision is not unique.  As

the court held in Colonial Funding, supra:

> Defendants' argument that the actual daily payments ensure that TVT will
> be paid the full receipts purchased amounts within approximately 61 to 180
> business days … is contradicted by the reconciliation provisions which
> provide that if the daily payments are greater than 15% of Epazz's daily
> receipts, TVT must credit the difference to Epazz, thus limiting Epazz's
> obligation to 15% of daily receipts.  No allegation is made that TVT ever
> denied Epazz's request to reconcile the daily payments.  TVT's right to
> collect the receipts purchased amounts from Epazz is in fact contingent on
> Epazz's continued collection of receipts….   None of defendants'
> arguments … change the fact that whether the receipts purchased amounts
> will be paid in full, or when they will be paid, cannot be known because
> payment is contingent on Epazz generating sufficient receipts from its
> customers; and Epazz, rather than TVT, control whether daily payments
> will be reconciled.

> .... The agreement was not a loan because 'plaintiff assumed the risk that, if the receipts were less than anticipated, the period of repayment would be correspondingly longer, and the investment would yield a correspondingly lower annual return.'

_Id_. at pp. 281, 283 (internal citations omitted).

Recently, in Power Up Lending Group, Ltd. v. Cardinal Energy Group, Inc., 2019 U.S. Dist. LEXIS 57527 (E.D.N.Y. April 3, 2019), Judge Hurley considered whether a merchant cash advance agreement which was structured essentially the same as the Merchant Agreements in this case constituted a loan.  The Court likewise held that the transaction was not a loan:

> There is no minimum payment, so if Defendants' accounts receivable were $0, then Plaintiff would receive $0 (after the end of month reconciliation).  While the Agreement requires Defendants Cardinal to provide bank statements in order to go into effect, this is within Defendants' control.  *See Kelly*, 950 N.Y.S.2d at 723; *see also Rapid Capital Fin. LLC v. Natures Mkt. Corp*., 57 Misc.3d 979, 982, 66 N.Y.S.3d 797 (N.Y. Sup. Ct. 2017) (considering an identical requirement and coming to the same result).  The only provision that in the reconciliation clause that is within Plaintiff's 'sole discretion' is a request for an adjustment for reasons other than a change in Defendant's monthly receipts, which does not fall within the parameters of a "reconciliation."  Likewise, the term in the Agreement is indefinite because it is contingent upon a specified percentage (18%) of Plaintiff's receipts – every time Defendant's receipts change the amount of time it will take for Plaintiff to be reimbursed will change, and there is no fixed end date by which Plaintiff must be paid.  … Finally, Defendant Cardinal is correct that the security interest and guaranty that Plaintiff can enforce in the event Defendant declares bankruptcy could suggest that the Agreement is a loan rather than a merchant agreement. However, 'protection of plaintiff's ultimate ability to collect its full entitlement insufficient, alone, to establish that this [Agreement] is, instead, actually a loan.' *Rapid Capital Fin*., 57 Misc.3d at 984.
>
> Based on the foregoing analysis, the Court finds that the Agreement is not a loan and, accordingly, that criminal usury does not apply.

Id. at * 15-16.  In this case, the Merchant Agreements do not provide that bankruptcy is an event of default; they only require disclosure of a bankruptcy filing.  Id. at §§ 1.11 & 3.1.

The same conclusion was reached by Judge Sullivan in Professional Merchant Advance Capital LLC v. C Care Services, LLC, 2015 U.S. Dist. LEXIS 189531, at p. * 2 (S.D.N.Y. Aug. 3, 2015) ("As an initial matter, the Court is satisfied by Plaintiff's supplemental submission that

the contract is probably not usurious.  Specifically, the contract is structured in a manner whereby if a $35,000 weekly payment represents more than the weekly accounts receivable of Defendant C Care Services, LLC ('C Care') for a particular week, Plaintiff credits that difference back to C Care.…  In light of this new information, the contract appears to be structured not as a loan but as a sale of accounts receivable.").

Notably, the court in Rapid Capital, supra, 57 Misc.3d 979, specifically held that the very reconciliation provision contained in the agreements at bar rendered the transaction a purchase and sale of receipts, not a loan.  In so doing, the court relied heavily on K9 Bytes, supra, 56 Misc.3d 807, which also dismissed analogous usury claims as a matter of law, based on the clear terms of the commercial agreements.  These holdings are consistent with many other state court rulings on this issue, including those of the appellate courts.  See Champion Auto v. Pearl Beta Funding, LLC, 159 A.D.3d 507 (1st Dept.), leave den'd, 31 N.Y.3d 910 (2018).

Defendants are not "predatory" lenders.  They are essentially factors that purchase a percentage of a business entities' future receivables based on an estimated daily payment system subject to a true up, typically on terms that simply reflect the significant risk the Defendants are taking in purchasing assets from this Merchant.  The reconciliation provision provides the vehicle for an audit, but it must be triggered by the merchant, who maintains the records of its actual receipts.  It is notable, and dispositive in this case, that Plaintiffs never requested a reconciliation, and have failed to disclose even to the Court what actual receipts the Merchant has generated.  The fact that a bankruptcy filing does not trigger a default is equally material.  Nothing in the record changes these dispositive facts.

While Mr. Whitaker self-servingly characterizes certain communications with the Defendants as improper threats or evasions, this does not change the legal nature of the

transactions.  Moreover, a review of the actual contents of the exchanges (e.g. Exhibit 38 to Mr. Whitaker's Declaration), reflects a Merchant who is attempting to entrap a third-party into making damaging admissions, having already retained an attorney and determined to file suit, through insults and antagonisms set forth in incomplete and un-authenticated text threads.  Nowhere in any of these communications does Mr. Whitaker claim that the remittances required by the contract exceed the specified percentage of receipts purchased and now owned by Defendants.  He only makes clear in his texts that the Merchant fully intends to cease performing under the contracts, which would constitute a breach.

### 2.   Plaintiffs may not seek affirmative relief based on usury or <u>unconscionability</u>.

It is well settled that usury cannot be used to retroactively pursue payments already made or to declare an agreement void; it can only be used as an affirmative defense to payment.  <u>Scantek Med., Inc. v. Sabella</u>, 582 F. Supp.2d 472, 474 (S.D.N.Y. 2008) (holding that debtor could not seek affirmative declaratory relief seeking to void agreement).   The same is true of unconsionability.  <u>K9 Bytes</u>, <u>supra</u>, 56 Misc.3d at 814 ("As for the eleventh cause of action, which seeks judgment voiding the merchant agreements because of unconscionability, defendants state, without contradiction, that unconscionability is not a claim, but a defense.  The court agrees.").

In the case at bar, Plaintiffs are seeking unspecified money damages and asking that the contracts they executed, and pursuant to which they received significant purchase prices, should now be "rescinded" and that Defendants provide restitution for past remittances.  Plaintiffs are precluded from seeking such affirmative relief.  Because Plaintiffs' true intention is to have this Court block Defendants' enforcement of Plaintiffs' imminent and intentional contractual default, they have jumped the gun and improperly sued Defendants when, as a matter of law, their claims could only be asserted as defenses to a payment action by Defendants, which has not occurred.

See <u>also</u> <u>Colonial Funding, supra</u>, 252 F. Supp. 3d at 279 ("The first two counterclaims seek to impose civil liability (damages) on all counterclaim defendants for TVT's claimed criminal usury. That is not allowed under New York law which allows a corporation to assert criminal usury as a defense, but not as a claim for affirmative relief.").

The foregoing cases establish that Plaintiffs may not seek affirmative relief in the form of money damages or retroactively nullify the agreements based upon their allegations that the Merchant Agreements constitute usurious loans or are otherwise unconscionable.

> **3.     Plaintiffs' claims sounding in fraud and misrepresentation are without merit and do not absolve the Merchant of its remittance obligations under the agreements.**

Plaintiffs allege that Defendants, or third-party brokers, misrepresented:  (1) the nature of their merchant cash advances; (2) that their merchant agreements are enforceable when in fact they are usurious loans; (3) that they will recalculate their payment amounts and reconcile their accounts; and (iv) short-changing Plaintiffs on their cash advances and overcharging them on fees deducted from the advances.  Complaint at ¶¶ 135 & 140.  These claims are not actionable and do no excuse the Merchant's wholesale failure to remit the receivables for which the Merchant was paid.

First, "[a] completely integrated contract precludes extrinsic proof to add to or vary its terms."  <u>Primex Int'l Corp. v. Wal-Mart Stores</u>, 89 N.Y.2d 594 (1997).  The rationale for this rule is that the presence of an integration clause establishes "the parties' intent that the [a]greement is to be considered a completely integrated writing."  <u>Id</u>.  A party seeking to overcome the "strong presumption of exclusion" resulting from an integration clause faces a high bar.  <u>Lee v. Joseph E. Seagram & Sons, Inc.</u>, 552 F.2d 447, 452 (2d Cir. 1997).

Section 4.8 of the Merchant Agreements provides as follows:

> Entire Agreement and Severability.   This Agreement embodies the entire agreement between the Merchant and [the Funder] and supersedes all prior agreements and understandings relating to the subject matter hereof.  In case any of the provisions in this Agreement is found to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired.

Complaint, Exs. 1-5.  Plaintiffs fraud claims are entirely based upon alleged misrepresentations that are extrinsic to the provisions of the Merchant Agreement.  However, those allegations are expressly barred by the terms of the commercial agreements.

Second, reasonable reliance, a necessary element of a fraud claim, "is precluded when 'an express provision in a written contract contradicts a prior alleged oral representation in a meaningful fashion.'"  Republic Nat'l Bank v. Hales, 75 F. Supp. 2d 300, 315 (S.D.N.Y. 1999) (quoting Villa Marin Chevrolet v. Gen. Motors Corp., 1999 U.S. Dist. LEXIS 17972, at * 5 (E.D.N.Y. 1999)).  In the case at bar, virtually every factual allegation made in support of the fraud claims is contradicted by the express terms of the agreements.

The Merchant Agreements expressly provide that they are "PURCHASE AND SALE OF FUTURE RECEIVABLES" which is followed by "Merchant hereby sells, assigns and transfers to [the Funders] (making [the Funders] the absolute owners) in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of moneys from Merchant's customers and/or other third party payors …, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to RDC."  Complaint, Exs. 1-5.  In addition, Section 1.8 of the Merchant Agreements states "Sale of Receipts (THIS IS NOT A LOAN) Merchant is selling a portion of a future revenue stream to [the Funders] at a discount, not

borrowing money from [the Funders]." Id.   Accordingly, Plaintiffs cannot claim that they reasonably relied on representations that they were receiving loans, not merchant cash advances.

Plaintiffs also allege that they believed one of the transactions was to serve as a consolidation of pre-existing contracts.  Complaint at ¶¶ 74-80.  Plaintiffs claim that, instead, they were provided with a "reverse" transaction whereby DDF would make daily deposits into the Merchant's account to pay the daily payments on the contracts that that Plaintiffs thought it was consolidating.   Once again, Plaintiffs "understanding" is contradicted by the terms of the Addendum to the DDF First Merchant Agreement, which expressly provides that the purchase price stated in the DDF Merchant Agreement will be deployed pursuant to a schedule of daily deposits set forth therein.  ECF Doc. No. 1-8, at p. 13.  Plaintiffs do not allege that DDF failed to make the daily deposits agreed to in the Addendum.

Plaintiffs' allege that the fees charged to them for the transactions were "fraudulent." However, there is no allegation that any Defendant made a contrary representation as to the fees, other than what is set forth in the contracts.   Specifically, each of the Merchant Agreements contains and Addendum that sets forth the fees that the Merchant would be charged.  See, e.g., ECF Doc. No 1-6, 1-7. 1-8, 1-9, & 1-10 at pp. 9, 9, 9, & 10, respectively.  To the extent that the Plaintiffs are claiming that any Defendant charged fees in excess of the Addendum, those allegations should have been asserted as a breach of contract claim, not one based upon fraud or negligent misrepresentation.  See Osan Ltd. v. Accenture LLP, 454 F. Supp. 2d 46, 56 (E.D.N.Y. 2006) (Plaintiff's demand [for compensatory damages] would either be entirely, or almost entirely, unrecoverable under its fraud cause of action because the same damages could be claimed under a breach of contract theory").

Courts have routinely dismissed substantially similar "fraud" allegations made by merchants seeking to invalid merchant cash advance agreements that they knowingly and voluntary entered into.   In Colonial Funding, supra, the defendants alleged that the funder and its principal referred to merchant cash advance agreements as loans, that in reliance on those statements defendants believed that the agreements would be loans, that defendants would not have entered into the agreements knowing they were purchases, and that defendants were harmed as a result by incurring the costs of the Agreements.  Id., 252 F. Supp.3d at 283.  The court held that "[j[ustifiable reliance on those statements is dispelled by the heading on the first page of each Agreement, signed by defendants, which states 'Purchase and Sale of Future Receivables,' and is followed by 'Merchant hereby sells, assigns and transfers to Funder … all of Merchant's future receipts … until such time as the 'Receipts Purchased Amount' has been delivered by Merchant to Funder."  Id.  at 284.

The court reached the same result in K9 Bytes, supra:

> Even if someone were confused by the contracts, or did not understand the obligation or the process, by reading the documents, one would grasp immediately that they certainly were not straightforward loans. The very first heading on the page was "Merchant Agreement," and the second heading says "Purchase and Sale of Future Receivables.") …. For plaintiffs to state that they would not have entered into a purchase or sale if they had known that that is what they were doing is utterly undermined by the documents themselves…. plaintiffs had the means to understand that the agreements set forth that they were not loans. As it has long been settled that a party is bound by that which it signs, the court finds that the ninth cause of action, for rescission based on misrepresentation or mistake, and the tenth cause of action, for fraudulent inducement based on misrepresentation, must be dismissed as a matter of law.

Id., 56 Misc.3d at 812-813.  Accord Womack, supra, 2019 U.S. Dist. LEXIS 148664, at p. * 22

("Essentially, both claims contend that Defendants misled Plaintiffs into believing that the Agreement was a loan with 8% interest. As previously discussed, the Agreement constituted a

purchase of future account receivables. The terms Plaintiffs claim Defendants misrepresented were disclosed in the written agreement, and thus cannot be the basis for a misrepresentation claim.").

Plaintiffs also allege that the Defendants were required to disclose that they were affiliated with each other and the precise identity of the funding sources.  As with virtually all of Plaintiffs' "fraud," claims the allegations are based on alleged omissions, not affirmative misrepresentations. However, nowhere do Plaintiffs establish any duty on the part of the Defendants to disclose the information allegedly omitted or the materiality of the omissions in the face of the contracts.

Indeed, a similar claim was dismissed in Womack, supra, where the Judge Carter held that the defendants had no duty to disclose the actual identity of their principal and that, in any event, the information was "immaterial":

> Plaintiffs assert that if they knew David Rubin's 'true identity' and 'nefarious past', they would not have entered the Agreement.  Like the other allegedly undisclosed information, Rubin's past and name change were discoverable. Plaintiffs cite to no case law suggesting that Rubin had a duty to disclose his alleged securities law violations or his name change. *See In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 471 (Bankr. S.D.N.Y. 2007) (holding that plaintiff was a sophisticated business person and, if she had any concerns as to the identity of a party to a transaction she could have insisted on more specificity in the agreement and she had an equal opportunity to discover the party's identity).  Therefore, Plaintiffs' breach of duty to disclose and fraud claims in Count II are dismissed.

Id., 2019 U.S. Dist. LEXIS 148664, at p. *21.  The same conclusion is warranted here.  The very purpose of these commercial agreements was to memorialize all the terms of the parties' dealings.

To the extent that Plaintiffs claim that business names other than the Funders' were involved with the transactions, Plaintiffs expressly consented to such conduct.  Section 1.5 of the Merchant Agreements expressly provides that:

> **1.15 D/B/A's**.  Merchant hereby acknowledges and agrees that [funder] may be using 'doing business as' or 'd/b/a' names in connection with various matters relating to the transaction between [funder] and Merchant, including the filing of UCC-1 financing statements and other notices or statements.

ECF Doc. 1-5, at p. 3, Section 1.15.

Finally, even if the Plaintiffs could demonstrate the other elements for a claim for fraud or misrepresentation, which they cannot, their claims fail because they do not allege any recoverable damages arising from any fraud.  As stated by the court in In re Eugenia Vi Venture Holdings, Ltd., 649 F. Supp. 2d 105 (S.D.N.Y. 2008), "[i]t is well-settled that to prove injury from fraud under New York law, a party must show actual pecuniary loss."  Accord Urtz v. New Hork Cent. & Hudson Riv. R.R. Co., 202 202 N.Y. 170, ("Fraud and deceit alone do not warrant the recovery of damages. Deceit and injury must concur.").  In New York, damages for claims of fraud and fraudulent inducement are subject to the "out-of-pocket rule," which confines plaintiffs to recovering actual losses sustained as the direct result of the wrong alleged, and excludes expected profits. Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 421 (1996).  Plaintiffs' claim based upon negligent misrepresentation is also subject to the "out-of-pocket" rule.  See Pasternak v. Dow Kim, 961 F. Supp 2d 593, 598 (S.D.N.Y 2013) ("Hence the out-of-pocket rule applies to both the claim for fraud and the claim for negligent misrepresentation.").

"Under the out-of-pocket rule, recovery of consequential damages naturally flowing from a fraud is limited to the sum necessary to restore a party to the position it occupied before the commission of the fraud."  See, e.g., Kaleidoscope Media Group, Inc. v. Entertainment Solutions, Inc., 2001 U.S. Dist. LEXIS 10801 (S.D.N.Y. 2001); Starr Found v. American Intl. Group, Inc., 76 A.D.3d 25, 31 (1st Dept. 2010) ("A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might be reasonably be expected to result from the reliance." (citations omitted)).

As set forth above, Plaintiffs cannot "justifiably" or "reasonably" rely on any representations made regarding the fees that the Merchant would be charged that are contrary to the express

terms of the Merchant Agreements signed by the Merchant.  Each of the Merchant Agreements that Merchant entered into with the Funders contain and Addendum that sets forth the fees that the Merchant would be charged.  See Complaint, Exs. 1-5.  Any claim that the Funders were charged a fee in excess or not contemplated by the Merchant Agreements would have to be asserted as a breach of contract claim, not one based upon the "fraud."  To the extent that the Plaintiffs are claiming that the disclosed fees charged are excessive or unlawful, those claims are also properly asserted as a breach of contract claim, not one based upon fraud or negligent misrepresentation. See Simington v. Lease Fin. Group, LLC, 2012 U.S. Dist. LEXIS 25671, at *30-31 (S.D.N.Y. 2012); Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004).

In fact, to the extent that any of Plaintiffs' alleged damages are based upon allegations that the Funders did not comply with their obligations under the Merchant Agreements, such claims must fail because Plaintiffs cannot seek to recover contract damages based upon claims sounding in tort.  Great Earth Intern. Franchising Corp. v. Milks Development, 311 F. Supp. 2d 419 (S.D.N.Y. 2004) (in order to sustain a claim of fraud, plaintiffs must "make an offer of proof demonstrating that the costs they seek to recover are unrecoverable as contract damages"); Osan, supra, 454 F. Supp. 2d at 56.

Plaintiffs have suffered no actionable damages from Defendants' alleged misrepresentations and concealment.  To the extent any Defendant shared or received confidential information, Plaintiffs ultimately agreed to and accepted and retained the benefits of the agreements they signed irrespective of how they came to be solicited.  Likewise, irrespective of how the transactions were characterized, the Merchant received working capital in return for a sale of percentage of its future receipts and seems to have netted a profit from the transactions.

Accordingly, Plaintiffs' "fraud" claims lack merit.

### 4.      **Plaintiffs' Equal Credit Opportunity Act claim is also meritless.**

Plaintiffs assert a cause of action against pursuant to the Equal Credit Opportunity Act (the "ECOA" – 15 U.S.C. § 1691) based upon allegations that the Funders "did not provide [Merchant] with the notice of adverse action as required by [15 U.S.C. § 1691(d)] when the Defendants refused to grant credit to Merchant on the terms requested, but pursuant to their bait and switch tactics, provided substantially different terms."  Complaint at ¶ 132.

The ECOA provides that it "shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction (1) on the basis of race, color, religion, national origin, sex or marital status, or age …."  15 U.S.C. § 1691(a).  The purpose of the ECOA is to eradicate credit discrimination against women on account of marital status.  See Steingerwald v. Bradley, 136 F. Supp.2d 460 (D. Md. 2001).  Plaintiffs do not, because they cannot, allege that the "applicant" in this case, the Merchant, a business entity, is a member of a protected class.  Even if Mr. Whitaker, individually, were the applicant, he is also not a member of a protected class and, therefore, not entitled to relief under the statute.  Nor is there any allegation of "discrimination" in the Complaint.

Plaintiffs claim that Defendants failed to provide notice of an adverse action in accordance with 11 U.S.C. § 1691(d).  To prevail on an ECOA notice claim, a plaintiff must prove that:  "(1) [the defendant] is a creditor; (2) [the plaintiff] is a loan applicant, (3) [the defendant] took adverse action with respect to [the plaintiff's] credit application, and (4) [the defendant] failed to provide the plaintiff with an ECOA-compliant notice of its adverse action."  German v. M&T Bank Corp., 111 F. Supp.3d 506, 527 (S.D.N.Y. 2015) (citations omitted).  However, in the case at bar, Defendants are not "creditors" as defined under the ECOA, in that they purchased assets from the Merchant, they did not extend credit or provide any loans.  See Capela v. J.G. Wentworth, 2009

U.S. Dist. LEXIS 89425 (E.D.N.Y. 2009).  Nor have they taken "adverse action" against the Plaintiffs as defined under the statute.  While Plaintiffs vaguely allege that Defendants "refused to grant credit to [Merchant] on the terms requested, but pursuant to their bait and switch tactics, provided substantially different terms," Complaint at ¶ 132, this claim is addressed, and resolved, by the contract, not by any federal discrimination or notice statute.

In Diaz v. Paragon Motors of Woodside, Inc., 424 F. Supp.2d 519 (E.D.N.Y. 2006), the Court analyzed whether an accepted counteroffer constitutes an adverse action under the ECOA, concluding that:

> Federal Regulation B narrows the definition of an adverse action to, '[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application *unless the creditor makes a counteroffer* (to grant credit in a different amount or on other terms) *and the applicant uses or expressly accepts the credit offered*.' 12 C.F.R. § 202.2(c)(1)(i) (emphasis added).  An adverse action does not include a 'change in the terms of an account expressly agreed to by an applicant.' 12 CFR § 202.2(c). Moreover, 'where a creditor's action falls within the definitions of what is adverse action and what is not adverse action, the latter definition is controlling.' *Haynes v. Bank of Wedowee*, 634 F.2d 266, 272 (5th Cir. 1981) (citing 12 C.F.R. § 202.2(c)(3)).

Id. at 532.

Similarly, in the case at bar, even if the contracts could be deemed "counteroffers" under the statute, the counteroffers were accepted by the Plaintiffs such that Defendants were not obligated to provide the "notice" required by 11 U.S.C. 1691(d).   Defendants did not take an "adverse action" against Plaintiffs.  They simply provided the Merchant with fully integrated commercial agreements which Plaintiffs signed as a condition for receiving the purchase price. The statute is wholly inapplicable.

### D.   The balance of the equities and public interest favors denying the Motion.

There is a "strong public interest in enforcing contracts between sophisticated entities." Deutsche Mex. Holdings S.a.r.l. v. Accendo Banco, S.A., 2019 U.S. Dist. LEXIS 180275 at p. *

20 (S.D.N.Y. Oct. 17, 2019) (quoting Epsiritu Santo Holdings, L.P. v. Libero Partners, L.P, 2019

U.S. Dist. LEXIS 84844 (S.D.N.Y. May 14, 2019)).  As the Court held in Sensus USA, Inc. v.

Franklin, 2016 U.S. Dist. LEXIS 50182 (D. Del. April 14, 2016):

> Parties who freely enter into binding agreements should expect to comply with the terms of those agreements….This agreement was entered into by two competent, business-savvy parties and was supported by consideration…. It is in the interest of the public to hold parties to the very terms upon which they negotiated and agreed to be bound.

Id. at p. * 26.

Through a broad injunction lasting an indefinite period of time, Plaintiffs are seeking a

license from this Court to breach the agreements, render them a nullity, deprive Defendants of their

bargained for remedies and security interest in the Merchant's assets, and cement the Merchant's

windfall.  The balance tips in favor of the Defendants, since an injunction may permanently

eviscerate their rights under the agreements, including the security interest and priority UCC rights

in the receivables Merchant sold to the Defendants.  Plaintiffs, themselves, allege that they are in

a precarious financial condition.  By contrast, there is no evidence that Defendants would not be

able or willing to satisfy a money judgment rendered in favor of Plaintiffs after trial.

**E.      In the unlikely event that the Court grants a preliminary injunction, Plaintiffs are required to post a bond.**

The requirement for a movant seeking a preliminary injunction to post a bond is

mandatory.  "The court may issue a preliminary injunction … only if the movant gives security in

an amount the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained." Fed.R.Civ.P. 65(c).  Where an injunction prevents

commercial, money-making activities, as it does here, such a bond is required and will not be

excused.  See Zambetti Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010).

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs' Motion for a preliminary injunction should be denied.

Dated:  New York, New York
        July 10, 2020

> BERKOVITCH & BOUSKILA, PLLC
> *Attorneys for BBF Partners, LLC,*
> *Day to Day Funding LLC, and*
> *Rapid Cap, Inc.*
>
> By:_____*Ariel Bouskila*_____
>         Ariel Bouskila, Esq.
> 80 Broad Street, Suite 3303
> New York, New York 10004
> (212)  729-1477
> *ari@bblawpllc.com*